Filed 10/26/21  In re N.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| In re N.G., a Person Coming Under the Juvenile Court Law. | D079105 |
| --- | --- |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. J.W., Defendant and Appellant. | (Super. Ct. No. SJ12727) |

APPEAL from orders of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

1

J.W. (Mother) appeals orders in the Welfare and Institutions Code section 300[1] dependency proceedings for her daughter, N.G., summarily denying her section 388 petition to modify the court's prior order appointing N.G.'s paternal grandmother as her guardian and then terminating Mother's parental rights and selecting adoption as N.G.'s permanent plan pursuant to section 366.26. As explained below, we affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2012, Mother gave birth to N.G. In February, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) dependency petition alleging that N.G. had suffered, or was at substantial risk of suffering, serious physical harm or illness because of the inability of Mother to provide regular care for her due to Mother's mental illness. The petition alleged that Mother had a mental illness and a history of auditory command hallucinations telling her that her baby was a curse and to kill her baby. It further alleged that Mother had a history of hospitalizations for suicidal ideation and hallucinations despite being medication compliant. It further alleged that N.G. had an older brother, C.W., then seven years old, who had been taken into protective custody when he was two years old after Mother was hospitalized for thoughts of suicide and harming him and was placed in the care of his maternal grandmother who assumed legal guardianship of him.

In its February 2012 detention report, the Agency stated that Mother had a diagnosis of schizoaffective disorder and during her pregnancy with N.G. had heard voices multiple times per day that encouraged her to kill N.G.

---

1    All statutory references are to the Welfare and Institutions Code.

The Agency also reported that R.G., N.G.'s father (Father), had been molested by a relative as a child while residing in the paternal grandmother's home and that Father molested his seven-year-old sister and, as an adult, had molested his four-year-old brother. Mother did not believe that Father had committed those acts of sexual abuse. Mother and Father lived together in the paternal grandmother's home. The court detained N.G. in the care of the paternal grandmother. Mother remained in the paternal grandmother's home, but Father left the home at the Agency's request due to the prior sexual abuse allegations.

At the April 2012 jurisdiction and disposition hearing, the court found the petition's allegations true, ordered a plan of legal guardianship for N.G., issued letters of guardianship to the paternal grandmother for the care of N.G., and terminated its dependency jurisdiction.

In May 2019, the Agency filed a section 388 petition requesting that the court modify its prior April 2012 order by detaining N.G. from the paternal grandmother and reinstating its dependency jurisdiction over N.G. The petition alleged that circumstances had changed since the prior order in that the paternal grandmother had allowed sexual perpetrators access to N.G. and Mother continued to exhibit mental health symptoms. The Agency's investigation found that the boyfriend of N.G.'s paternal aunt had sexually abused the paternal grandmother's 16-year-old son, which abuse sometimes had occurred in the paternal grandmother's home in which N.G. lived with Mother and Father. In addition, the paternal grandmother had knowingly allowed a registered sex offender (i.e., the paternal grandmother's cousin) to reside in and frequent her home. The Agency also learned that Father had molested a minor cousin in 2004. N.G.'s paternal aunt also reported that Father had forced sexual intercourse with her over a seven-year period,

beginning when she was seven years old. That paternal aunt was also sexually abused by the paternal grandmother's ex-husband, beginning when she was 13 years old.

Nevertheless, the paternal grandmother denied that Father had sexually abused any child, although she acknowledged family members regularly bathed together in her home. The Agency also learned that the paternal grandmother had not completed her parenting course and Father had not completed his sexual abuse offender course that they were asked to take before the paternal grandmother was appointed in 2012 as N.G.'s guardian. Also, Mother had been hospitalized about 20 times in the months preceding February 2019 and was again hospitalized in April after expressing a desire to harm herself. Mother had been additionally diagnosed with bipolar disorder. Mother denied that N.G. was at risk due to the allegations of sexual abuse and stated the Agency's investigation was unnecessary. N.G. informed her teacher that there was a limited supply of food in her home and she had to awaken her parents or grandmother to prepare food for her at mealtimes.

The court found the Agency had made a prima facie showing on its section 388 petition's allegations, reinstated its dependency jurisdiction over N.G., and detained her in out-of-home care. The court granted the paternal grandmother's request for a contested evidentiary hearing on the petition. In its addendum report, the Agency stated that N.G.'s maternal grandmother had requested the long-term placement of N.G. with her. In August 2019, N.G. was placed with her maternal grandmother. Per the court's suggestion, the Agency allowed the paternal grandmother to have unsupervised visits with N.G., although the paternal grandmother fell asleep during some of those visits. Also, N.G. held her bladder during those visits because the

4

paternal grandmother's home was highly unsanitary. Due to supervision and sanitation concerns, the location of the paternal grandmother's visits was subsequently changed to N.G.'s school.

Before the October contested hearing on the Agency's section 388 petition, Mother and Father (and presumably the paternal grandmother) withdrew their requests for an evidentiary hearing and the court thereafter proceeded based on the documents submitted to it. The court granted the Agency's petition, placed N.G. with her maternal grandmother, and ordered the paternal grandmother be provided with six months of services pursuant to section 366.3.

In its April 2020 post-permanency planning review report, the Agency stated that N.G. had been thriving since being placed with the maternal grandmother over six months before. N.G. had her own room, toys, and supplies and she was able to reside with her brother, C.W., who also lived in the maternal grandmother's home. N.G. reported that she felt happier and safer in the maternal grandmother's home. The maternal grandmother's home was more sanitary than the paternal grandmother's home. As the maternal grandmother assisted N.G. with her hygiene, N.G. became more confident at school and socialized with her classmates. N.G. read daily in the maternal grandmother's home and received an award for academic achievement. N.G. also participated in sports and went on outings, which she had not done while in the care of the paternal grandmother. During the review period, N.G. consistently told the Agency's social worker that she did not want to return to the paternal grandmother's home. N.G. reported that the paternal grandmother's home had a very foul odor and was unsanitary and its residents were unhygienic. N.G. had seen cockroaches and dead rats in the home when she lived there. When N.G. visited the paternal

grandmother and her parents there, N.G. was largely unsupervised and they did not engage with her. N.G. also disclosed that the relative who was a registered sex offender continued to come to the paternal grandmother's home. Nevertheless, the social worker reported that N.G. clearly loved the paternal grandmother and her parents.

The maternal grandmother reported to the social worker that N.G. told her that she did not want to return to the care of either the paternal grandmother or her parents. The maternal grandmother confirmed that the paternal grandmother's home smelled foul and was very dirty. The maternal grandmother stated that she was prepared to care for N.G. for the remainder of her childhood.

The social worker had visited the paternal grandmother's home on a few occasions and observed a foul odor both inside and directly outside of the home, causing her to become nauseated. She observed that the home was cluttered and unsanitary with cockroaches scurrying out from under the refrigerator. The home's refrigerator and stove were inoperable. During her visits to the home, the social worker observed that Mother appeared disheveled, tired, and depressed and, on a few occasions, appeared "out of it." The paternal grandmother reported to her that Mother had been recently hospitalized on a psychiatric hold. The paternal grandmother again adamantly denied the allegations of prior sexual abuse by Father, claiming they were misunderstandings.

In its review report, the Agency recommended that the paternal grandmother's guardianship be terminated, that a section 366.26 hearing be set to select a permanent plan for N.G., that N.G. remain in the maternal grandmother's care, and that the parents continue to have supervised visits

with N.G. The Agency believed that the paternal grandmother lacked insight into N.G.'s initial protective issues, failed to supervise N.G. during visits, and allowed in her home a registered sex offender and Father who remained untreated for sexual abuse issues.

In a subsequent addendum report, the Agency stated that N.G. continued to express her wish to remain in the maternal grandmother's home. N.G. reported that her home was cleaner and she wished to remain living with her brother, C.W. The maternal grandmother cooked for her, took her on outings, and facilitated her participation in sports. Although the paternal grandmother's home was cleaner than before, there were some remaining sanitation concerns as the social worker observed live and dead cockroaches and a foul smell during her recent visits. N.G. reported to the social worker that Mother had been hospitalized in July after attempting to break the windows of the paternal grandmother's home with rocks. Mother also bit Father when he tried to assist her while she was yelling and crying. During N.G.'s visits to the paternal grandmother's home, Mother provided most of her care.

In a subsequent addendum report, the Agency reported that N.G. continued to do well in the maternal grandmother's home. N.G. told the social worker that she did not want to spend the night at the paternal grandmother's home, fearing she would be unsupervised if something bad occurred. N.G. reported that Mother had been hospitalized again for a few days and had been hospitalized frequently. N.G. stated that she enjoyed visiting with Mother and that Mother cooked for her and assisted her when she cooked for herself.

In October, the paternal grandmother's sexual abuse prevention service provider reported that the grandmother was a slow learner, had missed several classes, lacked basic parenting knowledge, and minimized the protective issue, especially as to Father. The provider opined that the grandmother required more reinforcements and support to gain further insight and needed to continue receiving its services.

In October 2020, N.G. filed a section 388 petition, requesting that the court terminate the paternal grandmother's legal guardianship, set a section 366.26 hearing, and select a permanent plan of adoption by her maternal grandmother. Her petition alleged that she had been out of the paternal grandmother's care for more than one year and she did not wish to return and that she had bonded with the maternal grandmother and C.W. The petition alleged that the requested order was in N.G.'s best interest because she wanted to be adopted by the maternal grandmother and the maternal grandmother wanted to adopt her.

At the October combined post-permanency planning review hearing and contested hearing on N.G.'s section 388 petition, the Agency joined in N.G.'s petition and the court admitted in evidence all of the Agency's reports. The maternal grandmother testified that she had visited N.G. and Mother weekly since N.G. was three or four years old. Her relationship with N.G. had blossomed since she had been placed in her care. N.G. and C.W. had also bonded with each other. After one year in the maternal grandmother's care, N.G.'s reading level had improved from a below-kindergarten level to a third or fourth grade level. The maternal grandmother ensured that N.G. read at least 20 minutes each day. While in her care, N.G. also participated in several physical and extracurricular activities, which she had not done while living with the paternal grandmother. She testified that Mother had

diagnoses of bipolar and schizophrenic disorders and had been hospitalized several times as a result of her mental health symptoms.

Debbie Hernandez, the Agency's social worker, testified that she had concerns of Mother supervising N.G. during her visits at the paternal grandmother's home because of Mother's mental health issues. Mother had been hospitalized multiple times and had three recent psychiatric episodes.

The paternal grandmother testified that the sexual abuse allegations against Father were misunderstandings and he had not committed any sexual abuse, and she implied that he had merely leaned on his sister with his clothes on.

The court found that it would be detrimental to N.G. to return her to the paternal grandmother's care and terminated her guardianship of N.G. It also granted N.G.'s section 388 petition and set a section 366.26 permanency planning hearing.

In the Agency's section 366.26 report, it stated that N.G. continued to do well at school and in the maternal grandmother's care. Although N.G. had been visiting her parents at the paternal grandmother's home three times per week, she had asked to reduce the frequency of visits to once per week. At the initial section 366.26 hearing, N.G. informed the court that during her visits at the paternal grandmother's home, most of the adults slept while she was left unsupervised to play on her phone. The court granted her request to reduce the frequency of her visits to once per week and then continued the hearing.

In its addendum report, the Agency stated that the maternal grandmother had cared for N.G.'s medical, emotional, and developmental needs since August 2019 and was prepared to adopt her. N.G. felt safe and

well cared for in her home and also enjoyed living with her brother, C.W. N.G. understood the concept of adoption, was excited at the prospect of being adopted by her maternal grandmother, and wanted to live with her and C.W. permanently. She did not want to return to the paternal grandmother's home because she felt unsafe and unsupervised there.

At the continued section 366.26 hearing in May, the Agency recommended that the court terminate Mother's and Father's parental rights and select adoption as N.G.'s permanent plan. Because the parents sought a less permanent plan, such as guardianship, they requested, and the court set, a contested section 366.26 hearing.

In late May, Mother filed a section 388 petition requesting modification of the court's prior 2012 order selecting guardianship as N.G.'s permanent plan and requested a new order placing N.G. in Mother's care or, alternatively, providing reunification services to her to reunify with N.G. The court set the hearing on Mother's section 388 petition to be heard jointly with the contested section 366.26 hearing.

In its final addendum report, the Agency stated that its social worker's observations of N.G.'s visits to the paternal grandmother's home showed her parents did not act in a parental role toward her. During visits, her parents did not interact with her and spent most of their time playing on their phones. The Agency believed that it would be adverse to N.G.'s interests to be returned to their care.

At the June 9, 2021 hearing, the court initially heard arguments of counsel on the question of whether Mother had made a prima facie showing on her section 388 petition. The court found that Mother had not made a prima facie showing and summarily denied her section 388 petition. The

10

court then conducted the contested section 366.26 hearing, receiving in evidence the Agency's reports and the stipulated testimony of N.G.'s parents. Mother requested that the paternal grandmother's guardianship be reinstated, arguing that the paternal grandmother had completed her required courses, helped raise N.G. since birth, and allowed N.G. to live in the same home as Mother. The court found that N.G. was generally and specifically adoptable. It further found that any bond between N.G. and her parents was not outweighed by the benefits to her of adoption. Accordingly, the court terminated Mother's and Father's parental rights and selected adoption as N.G.'s permanent plan. Mother timely filed a notice of appeal challenging the June 6, 2021 orders.

## DISCUSSION

### I

### *Summary Denial of Mother's Section 388 Petition*

Mother contends the court erred by summarily denying her section 388 petition. In particular, she argues the court erred by finding that she had not submitted sufficient evidence to make a prima facie showing that her circumstances had changed since its prior order and that her requested change to that order was in N.G.'s best interest.

### A

Section 388, subdivision (a) provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to

Section 360 for a hearing to change, modify, or set aside any order of the court previously made or to terminate the jurisdiction of the court. The petition . . . shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." The burden of proof is on the moving party to show, by a preponderance of the evidence, that there are changed circumstances or new evidence and that the requested change would be in the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

In support of a section 388 petition, the moving party must show *changed*, not merely changing, circumstances. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 482.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] ' "Childhood does not wait for the parent to become adequate." ' [Citation.]" (*In re Casey D.*, at p. 47, quoting *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) A section 388 petition must be liberally construed in favor of its sufficiency. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.)

The petitioner "need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) However, if the petitioner does not meet that threshold showing, the juvenile court in its discretion may deny a request for a section 388 evidentiary hearing. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence

12

given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) Alternatively stated, a prima facie case is made on a section 388 petition if its allegations show section 388's two elements are supported by probable cause and need not show a probability of prevailing on the petition. (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) The petition's allegations must be specific regarding the evidence to be presented and must not be conclusory. (*In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 478.) In deciding whether a prima facie showing has been made, the court may consider the entire factual and procedural history of the case. (*In re Jasmon O.*, at p. 415; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.) A summary denial of a section 388 petition does not violate due process. (*In re Jasmon O.*, at p. 415; *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 460.)

The decision whether to grant or deny a section 388 petition is within the discretion of the juvenile court. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228; *In re Y.M.* (2012) 207 Cal.App.4th 892, 920.) Likewise, a decision to summarily deny a section 388 petition without an evidentiary hearing is within the juvenile court's discretion. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 460; *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 808.) On appeal, a reviewing court will not disturb a discretionary decision by the juvenile court unless it abuses its discretion by making an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) The appellant has the burden on appeal to affirmatively show that the juvenile court abused its discretion. (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

B

In her section 388 modification petition, Mother alleged there were changed circumstances since the court's 2012 order selecting guardianship as N.G.'s permanent plan and requested a new order placing N.G. in Mother's care or, alternatively, providing reunification services to her to reunify with N.G.  Specifically, her petition alleged circumstances had changed since the 2012 order because Mother had been participating in the Assertive Community Treatment program since March 2018 and, as a result, she had stabilized her mental health.  In support of that allegation, Mother attached a copy of a May 2021 letter from Megan Harris, a clinician with the Community Research Foundation, Adelante (CRF), in which Harris stated:

> "[Mother] has been an active participant in our Assertive Community Treatment program since 3/6/2018.  Over the last year, I have engaged [Mother] in individual therapy session[s] 2x per month.  Along with these services, [Mother] has frequent contact with other clinicians, case managers and nursing staff from our office.  Due to her engagement in services and intrinsic motivation, [Mother] has not been hospitalized since 9/26/2020.  She has built healthy coping strategies that assist her in managing mental health concerns and has developed self-advocacy skills.  I have witnessed tremendous growth in [Mother]."

Mother's petition further alleged that her requested order was in N.G.'s best interest because "[N.G.] has spent the majority of her life in the same home as [Mother] and as such is bonded with [Mother]."

At the June 6, 2021 hearing, the court stated that it had read Harris's letter indicating that Mother had been participating in services and had shown tremendous growth.  However, the court concluded that the letter did not show a sufficient change in circumstances or new evidence in support of

14

the allegations in Mother's section 388 petition.  The court further concluded there was no evidence that Mother's requested order would be in N.G.'s best interest.  Based thereon, the court summarily denied Mother's section 388 petition.

C

Based on our review of the record, we conclude the court did not abuse its discretion by summarily denying Mother's section 388 petition.  In particular, we conclude the juvenile court correctly found that her petition, along with its attachments, did not make a prima facie showing that: (1) there were changed circumstances or new evidence since the prior order; and (2) her requested order was in N.G.'s best interest.  In support of her allegation of changed circumstances or new evidence, Mother provided only a one-paragraph letter from her CRF clinician stating that Mother had not been hospitalized since September 26, 2020.  The clinician further stated that Mother had developed self-advocacy skills and built healthy coping strategies that assisted her in managing her mental health and that she had witnessed tremendous growth in Mother.  However, the letter's assertions regarding Mother's growth, even if accepted as true, did not provide sufficient evidence to support a finding that Mother's mental health circumstances had, in fact, *changed* within the meaning of section 388.  Given Mother's mental health diagnoses and long history of recurrent hospitalizations over at least a 10-year period, the court could have reasonably concluded that the allegations in Mother's section 388 petition and its supporting letter showed, at most, that her mental health circumstances were changing and had not yet changed.  As the Agency notes, Mother had been hospitalized and/or experienced psychiatric episodes 10 to 20 times since she began participating in the CRF program in 2018.  While Mother should be commended for the progress she

15

apparently had made by not being hospitalized since late September 2020, that progress showed, at most, *changing*, and not changed, circumstances in her mental health given the record in this case. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 49; *In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 482.)

Furthermore, although Mother's section 388 petition alleged that her mental health had stabilized, that allegation was conclusory and was unsupported by the attached letter and the record in this case. Regarding the attached letter, it did not, as the Agency notes, set forth the clinician's qualifications or credentials and her ability, if any, to treat Mother's specific mental health diagnoses of schizophrenic and bipolar disorder. The letter also did not describe what individual therapy Mother received twice a month from CRF clinicians and to what extent Mother had made progress toward any specific treatment goals. The letter also provided no information about CRF's services in general or the specific program in which Mother had participated. Absent such foundational information, the clinician's assertion that she had witnessed tremendous growth in Mother provides insufficient context or meaning for a court to conclude that Mother's mental health circumstances had, in fact, changed. Accordingly, the court correctly concluded that Mother had not made a prima facie showing that there were changed circumstances or new evidence since the prior order. Because Mother had the burden to prove both prongs under section 388 (i.e., changed circumstances *and* her requested order was in N.G.'s best interest), Mother's failure to make a prima facie showing of changed circumstances or new evidence, by itself, provided the court with a sufficient legal basis on which to summarily deny her section 388 petition without further considering the question of whether her requested order was in N.G.'s best interest. (*In re*

16

*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *In re Aljamie D.*, *supra*, 84 Cal.App.4th at p. 432.)

Because Mother failed to make a prima facie showing on the first of the two elements for a section 388 petition, we need not address the additional question of whether she made a prima facie showing on the second element (i.e., that her requested order was in N.G.'s best interest). Nevertheless, we elect to briefly address that question and likewise conclude Mother failed to make a prima facie showing that her requested order was in N.G.'s best interest. In her section 388 petition, Mother alleged that her requested order of placement of N.G. with her or, alternatively, provision of reunification services to her, was in N.G.'s best interest because N.G. had a bond with Mother based on her living with Mother for most of her life. However, the record shows that Mother had never been N.G.'s primary caregiver. Instead, N.G.'s primary caregivers were initially the paternal grandmother and, more recently, the maternal grandmother.

The record also shows that Mother has suffered from serious mental health problems for many years and has a long history of hospitalizations as a result of those problems. During N.G.'s case, Mother never progressed to unsupervised visits, much less overnight visits, with her. Also, Mother continued to be in a relationship with Father, who apparently remained untreated for his sexual abuse history. Mother and Father lived together in the home of the paternal grandmother, who had failed to protect children from sexual abuse in her home and, in particular, continued to deny the allegations of past sexual abuse by Father.

Regarding living with Mother in the paternal grandmother's home, N.G. had repeatedly stated that she was uncomfortable visiting, much less

17

living in, that home because of its unsanitary conditions and the failure of the adults living there to supervise her. Importantly, N.G. stated she did not want to return to living in that home and consistently stated her wish to instead remain in the maternal grandmother's care. Also, N.G. had been thriving in the maternal grandmother's care, becoming more confident and social and improving academically, and enjoyed living with her brother, C.W. Finally, Mother's petition did not describe the nature or quality of the alleged "bond" that N.G. had with Mother and provided no support showing that maintaining that bond by placing N.G. in Mother's care (or, alternatively, continuing N.G.'s guardianship with reunification services for Mother) would be in her best interests. Given that amorphous and conclusory allegation of N.G.'s bond with Mother, the court could reasonably conclude that the record in this case overwhelmingly showed that Mother's requested order would not be in N.G.'s best interest. (*In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 478 [§ 388 petition's allegations must not be conclusory].) The court implicitly, and reasonably, found that Mother's requested order would not advance N.G.'s need for permanency and stability, which she presumably could have through adoption by her maternal grandmother. (Cf. *In re J.C.* (2014) 226 Cal.App.4th 503, 526 [after termination of reunification services, parent must show requested order will advance child's need for permanency and stability].) Accordingly, the court properly concluded that Mother had not made a prima facie showing that her requested order placing N.G. in her care or, alternatively, continuing her guardianship with reunification services for Mother would be in N.G.'s best interest. Because Mother did not make prima facie showings on either of the two elements she was required to prove, we conclude the court did not abuse its discretion by summarily denying her section 388 petition. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 317-318; *In*

18

*re G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *In re Aljamie D.*, *supra*, 84 Cal.App.4th at p. 432.)

## II

### *Beneficial Parent-Child Relationship Exception*

Mother contends the court erred by finding at the contested section 366.26 hearing that the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude termination of her parental rights and selection of a permanent plan of adoption for N.G.

### A

The purpose of a section 366.26 hearing is to determine and implement the appropriate permanent plan for a dependent child. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) The juvenile court can choose among three permanent plans: adoption, legal guardianship, and long-term foster care. (§ 366.26, subd. (b).) When a child is adoptable, adoption is the preferred permanent plan unless there are countervailing circumstances or adoption is not in the child's best interest. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 546; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574.)

At a section 366.26 hearing, it is the parent's burden to show an exception to termination of parental rights. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) One exception is when termination of parental rights would be detrimental to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent must prove three elements: (1) the parent has maintained regular visitation and contact with the child; (2) the

19

child has a beneficial relationship with the parent, including a substantial, positive, and emotional attachment to the parent; and (3) the child would suffer detriment from termination of that relationship even when balanced against the countervailing benefit of a new, adoptive home.  (*Ibid.*; *In re Caden C.* (2021) 11 Cal.5th 614, 636-637.)  The third element may alternatively be described as requiring proof that the beneficial relationship between the parent and child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

In making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395, 397.)  Because interaction between a child and his or her parent will generally confer some incidental benefit to the child, the parent must prove the child will benefit to such a degree as to overcome the preference for adoption. (*Ibid*; *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)  For the beneficial parent-child relationship exception to apply, the parent must show, inter alia, that the emotional attachment between the child and the parent is of a parental nature rather than one of a friendly visitor or friendly nonparent relative. (*In re Angel B., supra*, 97 Cal.App.4th at pp. 467-468; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)

20

Some of the factors the juvenile court should consider when determining whether the parent-child relationship is important and beneficial are: (1) the age of the child; (2) the portion of the child's life spent in the parent's custody; (3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs. (*In re Angel B.*, at p. 467.)

On appeal, we apply a hybrid standard (i.e., both substantial evidence and abuse of discretion standards) in reviewing a juvenile court's determination whether the beneficial parent-child relationship exception applies. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.) "We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.) Under the substantial evidence standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's order and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

B

Mother asserts the court erred by finding the beneficial parent-child relationship exception did not apply to preclude termination of her parental

21

rights because she shares a strong bond with N.G. that was formed by living with N.G. in the paternal grandmother's home and was maintained through consistent and meaningful visitation with N.G. after she began living with the maternal grandmother, and therefore termination of their relationship would be detrimental to N.G.  Mother argues that the benefit to N.G. of maintaining her relationship with her outweighs any benefit to N.G. of a permanent, adoptive home.

Regarding the first element of the beneficial parent-child relationship exception, the Agency concedes, and the record supports a finding by the court, that Mother maintained regular visitation and contact with N.G. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at p. 636.)  In particular, the record shows that Mother lived in the paternal grandmother's home during the entire period that N.G. lived in that home and consistently visited with N.G. thereafter when N.G. was placed in the maternal grandmother's care.

Regarding the second element of the exception, the court implicitly found that N.G. did not have a beneficial relationship with Mother that included a substantial, positive, and emotional attachment to her.  (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Although the court found that N.G. loves Mother and stated, "there is a bond there," the court did not further find that N.G. had a substantial, positive, and emotional attachment to Mother. (*In re Caden C.*, at p. 636.)  The court presumably considered the entire record, including the Agency's reports, which included information about how N.G. felt about, interacted with, looked to, and talked about Mother. (*Id.* at p. 632.)  The court expressly noted how N.G. felt extremely stressed about her obligation to visit with Mother.  The court stated:  "[T]hat [visitation] requirement is stressing her out.  And it's creating

22

some subtle pushback where [N.G.] has been expressing that desire to cut back on the visits. And [N.G.] has actually expressed a desire to be adopted." Based on those comments, we conclude the court implicitly found N.G. did not have a beneficial relationship with Mother within the meaning of section 366.26, subdivision (c)(1)(B)(i).

We conclude there is substantial evidence to support the court's finding that N.G. did not have a beneficial parent-child relationship with Mother. Although N.G. clearly loves Mother, that factor does not, on its own, show there is a beneficial parent-child relationship. (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 529.) On the contrary, there is ample evidence showing such a beneficial relationship does not exist. The record shows that Mother had never been N.G.'s caregiver over her nine-year life. Also, N.G. had not lived in the same home as Mother since August 2019, when the maternal grandmother began providing all of N.G.'s needs. Importantly, even when N.G. lived in the same home as Mother and thereafter during her visits to the paternal grandmother's home, Mother was never alone with N.G. for any substantial period and had little meaningful interaction with N.G. Rather, during N.G.'s visits, Mother, along with Father and the paternal grandmother, typically played on their phones and left N.G. unsupervised to play alone. According to the Agency, N.G. did not view Mother as a parent.

Also, N.G. was embarrassed by Mother's mental health and hygiene. Presumably lacking a significant bond with Mother, N.G. had requested that the frequency of her visits with Mother be reduced to once per week, which request the court granted. Even thereafter, N.G. stated that she attended her weekly visits with Mother only because she felt obligated to attend them and expressed her wish that her visits with Mother be discontinued and she be adopted by the maternal grandmother. Based on the evidence, the court

23

could reasonably find that Mother's relationship with N.G. was not parental in nature, but instead one of a friendly visitor or friendly nonparent relative. (Cf. *In re Angel B.*, *supra*, 97 Cal.App.4th at pp. 467-468; *In re Beatrice M.*, *supra*, 29 Cal.App.4th at pp. 1418-1419.) Accordingly, there is substantial evidence to support the court's finding that N.G. did not have a beneficial relationship with Mother, including a substantial, positive, and emotional attachment to Mother, within the meaning of section 366.26, subdivision (c)(1)(B)(i). (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636.) To the extent Mother cites evidence or inferences therefrom that would have supported a contrary finding by the court, she misconstrues and/or misapplies the applicable substantial evidence standard of review. (*In re S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)

Assuming arguendo there was insufficient evidence to support the court's finding that the second element of the beneficial relationship exception was not shown by Mother, we nevertheless conclude the court did not abuse its discretion by finding that Mother failed to carry her burden to show the third element of that exception. Specifically, we conclude the court reasonably found that Mother had not shown that N.G. would suffer detriment from the termination of her relationship with Mother even when balanced against the countervailing benefit to N.G. of a new, adoptive home. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, *supra*, 11 Cal.5th at p. 636.) The substantial benefits to N.G. of termination of Mother's parental rights and selection of adoption as her permanent plan are amply shown by the evidence in the record. Since N.G.'s placement with the maternal grandmother in 2019, N.G. had thrived. With her improved hygiene, she became more self-confident and social. She greatly improved her academic performance. The maternal grandmother ensured that N.G. read at least 30 minutes per day.

N.G. formed a close bond with her older brother, C.W., and wished to remain living with him and the maternal grandmother. The maternal grandmother's home was more sanitary than the paternal grandmother's home and, presumably, safer as a result. Also, living in the maternal grandmother's home, there were no concerns of N.G.'s exposure to sexual abusers as there were in the paternal grandmother's home.

Importantly, N.G. had a long-standing relationship with the maternal grandmother and consistently expressed her wish to be adopted by her. In turn, the maternal grandmother stated that she loved N.G. and wanted to adopt her and provide her with as good a life as possible. Finally, the Agency recommended that the court terminate Mother's and Father's parental rights and select adoption as N.G.'s permanent plan. Based on the record, the court did not abuse its discretion by finding that the benefits to N.G. of adoption (e.g., a stable and permanent home) outweighed the benefits to her of maintaining her relationship with Mother, whether the relationship was that of a friendly relative or even a beneficial parent-child relationship, and therefore the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude the termination of Mother's parental rights and selection of adoption as N.G.'s permanent plan. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) To the extent Mother cites evidence or inferences therefrom that would have supported a contrary finding by the court, she misconstrues and/or misapplies the applicable abuse of discretion standard of review. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

## DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:

GUERRERO, J.

DO, J.

26